Case No. 16-1193 Arkansas Public Service Commission Petitioner v. Federal Energy Regulatory Commission Mr. Lane for the petitioner, Ms. Banta for the respondent Ms. Banta for the respondent Good morning. I've asked to reserve two minutes for rebuttal. I want to talk about the rightness issue first. The Commission argues that the Court should wait and see whether EIA owes $67.8 million or some other amount before it decides this case. We asked and the Commission agreed that the Commission had taken final agency action on this issue of whether EIA is liable for these further bandwidth payments post-withdrawal. The Commission, as you may recall, did this in a hearing order where they were setting up a hearing for factual matters in this case. They did not say that there was any factual issues that needed to be developed at the hearing related to the legal question of EIA's post-withdrawal liability. They didn't say that there was any need for further development to crystallize the issue. They just said it was final agency action. There's no reason for you to wait. This case is right now and we would urge you to go forward with it. On the merits... Can I just go back and ask about why there was not notice of liability, this liability issue from the 2014 orders and why that isn't when the challenge should have been made and so this is more collateral attack. As you said, the order of review was just setting up a settlement proceeding. It was sort of a logistical administrative order, not a liability determination. That had already been made. It was sort of a tag team of the 2005 Louisiana Public Service decision and then the 2014 decisions which made clear that Energy Arkansas's liability in particular was going to continue post-withdrawal. I think a simple way to see that is if you have the joint appendix, we could start on because what's not clear in this case may not be clear. I think it was clear to us, but Energy Arkansas paid $156 million and you can see on page 16, the bottom chart there, that payment receipt as of December 2011 was $156 million and then to the left of that, there's $167 million. What we're really talking about and actually if you go over to page 18, I don't want to go through all the calculations, but you'll see that there was a payment made at the time. That was the time of that order and we're not challenging that payment. We're not asking for that payment to be given back. No, but I'm just saying it was clear since the Louisiana decision that Energy Arkansas was going to have liability under this bandwidth procedure. So that was already established and the only question was whether it was going to continue after withdrawal. Right. And the 2014 orders identifying Energy Arkansas after it had already withdrawn after the end of December 2013, after that point, says here's what you owe. Right. And so that answered the liability question, did it not? And we brought... That wasn't the issue in the settlement proceeding that's under review here. It was already decided before that, was it not? No, I don't think so, Your Honor. I think we challenged the 2014, the hearing order when this came up. This is where this came up. This came up, Energy made... This is the compliance filing, what you are looking at right now on page 16. And we challenged that to say, look, no, EIA has withdrawn. That was the first time that they withdrew. The $156 million was the earlier order and that was in 2011 when EIA was still in the agreement. And so we didn't challenge that. I think the order that you're talking about is actually found at the... Kind of confusing here, but it's found at the end of the J.A. I thought there were two orders that they were relying on for this collateral attack. One is they both issued on February 28, 2014. Order rejecting compliance filing and order on rehearing. Right. Is that right? Those are the two. Correct. We brought rehearing of the February... The hearing order. We challenged, we protested that. Our protest is in the J.A. and the commission then issued its order. We filed for rehearing timely and the commission issued the order on rehearing. And that was protesting your liability for... Correct. It was $156 on J.A. 611. Right. And then they added interest on in the next one. Right. And you didn't seek judicial review. Of that order, we didn't seek judicial review because EIA was still under the system agreement. That was 2011 order. No, it's February 2014. Okay. I don't... It's like J.A. 611, which is the first of the two orders. Right. Right there on the chart, clear as day, Energy Arkansas owes $156 million, I guess, and that is after withdrawal. And then as you noted, the other February 28 order on rehearing says and we're adding interest on top of that. Right. So Energy Arkansas's liability to pay post withdrawal was already determined in February 28, 2014, and you didn't seek judicial review of that. Instead, we're here reviewing an order on settlement and administrative proceedings. No. Okay. I think that the... Well, the February 28 order did not raise any question about post withdrawal liability. And whether there was interest on the $156 million, there's an... Okay. Maybe that's where... If you go back to 16, you'll see that now it's $167 million that they're claiming that EIA owes. Right. And that difference is the amount that we're talking about. We didn't challenge the $156 million, because that was actually paid in 2011. That's what... If you turn over and you look at JA-21, and this is where... There's a whole... You can see they're making interest calculations, and you can see in the middle of the page, there's just one figure, and that's $156 million. They paid that, and that was in December 2011. So they paid it. They were under the system agreement at that time, and we didn't challenge that. What we're challenging is if you go... But the February... At least the re-hearing order says you still owe more if you owe interest. Correct. And is that... Do that interest run... Did that interest stop at the end of December 2013? No. You can see in the column... Right. It keeps going. So... Yeah. You can see in the column, right, on 21, just to the left of where the $156, that column is the monthly interest calculation. Right. So why wasn't that a determination of your post-withdrawal continuing liability for obligations incurred while you were still within the system? Why wasn't that decided in February 2014? And you could have... Because it didn't say anything about post-withdrawal liability. It said, here's a bill, post-withdrawal. So I guess your argument is... It's indisputably true that the bill, the amount, was dictated post-withdrawal. It actually happened post-withdrawal. The withdrawal had already happened, and then the order comes down. Correct. Right? So that... It definitely happened post-withdrawal. So your argument is that even if it actually happened post-withdrawal, it didn't take into account the legal argument that our withdrawal should have eliminated our liability. Exactly. That's your argument. Exactly. But then it just becomes a question of whether that was inherently taken into account because you actually had withdrawn. So was the commission operating on the assumption that this is your liability? Yes, you've withdrawn. Everybody knows you've withdrawn because that's a fact about the world that nobody can dispute. And therefore, here's your liability given the fact of your withdrawal. And if that was true, then it seems like judicial review could have happened from that. I don't think the commission... I don't think the order at JA611 contemplated what you just stated. The order at 611, I don't understand why that's relevant at all. In that order, the commission rejected Energy's compliance file. Excuse me? It rejected Energy's compliance file. Right. So it doesn't do anything to you. It just rejected the filing. Yes, and we asked that it be rejected. Right, so it didn't compel you to do anything. Isn't that your answer to that one? That was our answer, yes, below. And that's what we argued. And the commission conceded in their brief that we didn't have to seek rehearing. At the time, this was all being briefed and presented to the commission. It was like the second half of 2013. Am I right on that? So you knew withdrawal was coming. And they were saying we should have interest. You're saying you weren't on notice that we should say we can't be obligated to pay anything after December 2013? You didn't have any idea that would be coming? Your Honor, everybody was on notice from 2005 that EIA was going to withdraw in December of 2013. I'm asking a different question about what notice were you on in late 2013 when this was pending before the commission and filings were being made on rehearing that they were talking about interest obligations that you might have to pay in 2014 that would cover your time while you were still under the contract pre-2013. When they talked about interest, did you think the interest was going to stop at the end of December 2013? Yes. I mean, our position is yes, the interest should have stopped with the payments. If there were no principal, there would be no interest with the payments after withdrawal. That was our position.  We filed a protest and said, no, you can't. There's no post-withdrawal liability for EIA and that started the process. And then there was the commission's hearing order we filed for rehearing. So they were on notice of your argument about this and they nonetheless in February 2014 sent you a bill for interest. The commission... No, I think it's a little different. Now I think I understand perhaps where... All right, so Enter Gene made a compliance filing. They didn't include interest. That's the order at 6-11 and the commission said, oh, you have to do interest on this compliance. They rejected that compliance filing. As Chief Judge Garland said, it was rejected. It was a nullity. There was nothing. They had to come back with a new filing in which they included interest and that's what we see on page 16. They came back, they put in the interest. That's when this compliance filing came in. That's when the interest question came in post $156 million and additional amounts, another $11 million in principal plus the interest came in and we protested that and said, no, they're not liable. They have withdrawn. That's the part we're talking about. And then we saw a rehearing and... Can I ask one fact question? I know this has been about the seven months in 2005. Would the ruling in this case implicate obligations on Energy Arkansas to make similar payments for 2006, 07, 08, 09, 10, 11, 12, and 13? I'm trying to figure out what's at stake here. All right. Well, to answer that question, you have to know how the system agreement works on the bandwidth payment. Just to make it really... It's just a fact question. Would you have to pay more in other years as well? So what happens is, and if you look on page... I'm looking on page 20 of the JA, but you could look at... So what happens is Energy says to you, these are the bandwidths in May of the year. And then you have to pay and you can look in the column on page 20 and you'll see that they were supposed to make... It's over, I think, a six-month period, seven-month period. You're supposed to make the payments at that time. So EIA has made those payments for all the years in which they were under the system agreement. Then there are hearings and basically the hearings are like this situation where they're arguing, oh, those bandwidth payments weren't enough. Basically, it's always EIA paying more. And so what we're arguing is about the paying more. We're not asking the commission or the court to say, no, we didn't owe any of the bandwidth payments. The parts that we paid, like the $156 million during the time that we were under the agreement, we're not asking for that to come back. We're just asking for... Just to use the example from 16, for the $11 million plus any interest related to that, because that amount was determined after the system agreement was terminated. I'm sorry, go ahead. One factual question is once the notice of intent to withdraw is filed in 2005, is that something that... Does that mean that withdrawal is definitely going to happen? Yes. It does. So once that happens, there's nothing that can happen to unring the bell that in no subsequent step. I don't know technically whether there's a way out. I don't believe that there is. And certainly, factually, there was no question, but that EIA was going to withdraw in December of 2000. There's no subsequent step that is required to effectuate the withdrawal. No. That's what you found in New Orleans, that all you had to do was put the eight-year notice. There were no other obligations. If that's what your question... No, you found in New Orleans that the eight-year notice was the only requirement for leaving. On the merits, your argument is that once you withdraw, you don't owe anymore. Is that right? That's right. Even for cases where other parties performed during the time when you hadn't withdrawn. Is that right? Well... Was that your position? The answer is yes, that's our position, but other parties... Remember, this is about bandwidth payments, and what the bandwidth payments are about the production cost. To just simplify it, EIA had a lot of coal production, and the other companies had natural gas. During the time period when the bandwidth got out of whack, natural gas prices, as you probably recall, were very high. The bandwidth is just trying to get that back to rough. Unfortunately, I've sat on these cases, so I do pretty well understand. I'm just saying the way you phrased it, Chief Judge Garland, was to suggest that somehow people provided us with service. They sold us electricity, they sold us capacity, whatever. No, they didn't. This was just, as you know, a rough way. The bandwidth was a rough way to get those production costs back in. But in a way, it was part of the consideration for the whole Entergy system to continue going during that period. It was. Indeed, it was. Our argument is those kind of equitable principles, which you're making the argument that the Commission did in its order. I'm just trying to be clear. You're saying that the background principle is it has to be in the agreement. Exactly. Exactly right. In the Uniform Commercial Code, it says, on termination, all obligations which are still executory on both sides are discharged, but any right based on prior breach or performance survives. And that is without regard to what's actually in the document. Why isn't that the background principle here? I think, in our view, because this Court said in New Orleans, the Commission said over and over again, that there was no obligation other than the eight years. It says no exit fees. Is that what you mean? I think if you... We've quoted a number of the... Yes, it said no exit fees, but it also said no obligation, no payment. It wasn't just exit fees, and we could debate what exit fees are. Well, so if your only background principle is one that you think we established, I guess it's something else. No, no. I'm sorry. I lost my train of thought. It did occur to me. We pointed out in our briefs, we quoted other cases where the parties specifically agreed that when you withdraw, you have to pay up all your accrued obligations. There's nothing like that here. Right, but the question is whether that's required. That is, whether it has to say in an agreement that once the agreement is over, you still owe for the things that you did during the agreement. That's correct. And the fact that some parties sometimes do that or don't doesn't really establish what the answer is. The question is, what is the background principle in the absence of saying anything one way or the other? And what we're saying, the commission said that's the Nolte brothers case. And the commission said, yes, look at Nolte brothers. Nolte brothers didn't turn on the silence. To the extent there was silence in Nolte brothers, what the court said was, oh, yes, there's silence, and maybe that does mean that you have to arbitrate. Because remember, it wasn't about the accrued obligations. I'm even less interested in Nolte brothers itself, but rather in terms of just general background understandings in contract law. So if I make an agreement with my law clerks that they will be get paid once a month if they work. And it provides me with the opportunity to end their term of service after one year or two years. And I decide, not at all because of bad work by my law clerks. But just as time for a fresh group. They can't take deferred cases. Too many deferred cases. Maybe that's it. Good point. And I'm going to say we're going to stop on June 1st. And they still haven't been paid yet, even though they worked all of May. Is your position that they are not entitled to be paid for what they worked? If the contract didn't say that, that's the Osco brush case, Your Honor. Exactly the Osco brush case was. So they should have held out for a contract that says, if I do all of my work for you perfectly, and you haven't paid me at the end of the contract, you still have to pay me. They should have. I'm sorry. I think I interrupted you. No, I had a similar question. I'm just not familiar with that being a background assumption of contract law. In fact, I thought the background assumption typically is the opposite. That, of course, parties can specify that payment is owing based on past performance. But in the absence of specification, the expectation, the normal expectation on part of parties entering into an agreement is that if there's performance, there's going to be performance on the other side, too, notwithstanding withdrawal. I guess we just read the cases differently. If you look at the cases the commission relied on, they look for specific contract language, Nolte, Osco brush, John Wiley. Is there any case that in the absence of such language said performance isn't required? There was none cited by the commission, and we didn't raise any, no. Okay. All right. We'll hear from you. Thank you, Your Honor. All right. Good morning. I'm Carol Banta for the commission. Ms. Banta, could you start with this collateral attack issue, this question of whether they needed to have, I take it the government is not pressing that argument and gave us an idea of what your position is. We did make the decision not to pursue that in our brief. I would point out that collateral attack is both statutory and jurisdictional, so the commission cannot waive it. The interveners raised it, and they argued it. Are you not pressing it because you just don't want to or because you don't think that this is a jurisdictional bar at this point, that this is not really a collateral attack? I thought it was a very close call. Sometimes being an agency that's acting in the public interest, we don't make the most aggressive jurisdictional argument that we could. Well, just to be clear, the commission made that very aggressive, if you call it aggressive jurisdictional argument in its decisions, both of its decisions, saying there was just no uncertainty at all as to what happened here. I should say commission counsel, it's on me. It was a strategic decision that it seemed like an aggressive argument. What do you think the right jurisdictional answer is? What do you think the correct jurisdictional answer is? I think the correct jurisdictional answer is that everyone in this band of litigation understood that Arkansas was in the mix. If you look at the math... How does that relate to jurisdiction? They understood when they said that the 2011 compliance filing was made in the remand proceeding, which went on and was affirmed by this court in August, that you're going to pay for 2005. When the commission rejected the... It took until 2014 because there were overlapping proceedings going on. The remand proceeding was held in abeyance to wait for something else to happen. That's why it took the commission until 2014 to rule on the 2011 compliance filing. It rejected it. The petitioner's position is, well, we didn't have any reason to believe we'd be included in the next one. But if you look at the math for 2005, Andrew G. Arkansas was the only entity that had to pay the other entities. It was the only entity that the holding on interest would apply to. Which order do you think this is a collateral attack on? It's a collateral attack on the compliance order, like the commission did say... Which one? What order? That is JA 607. That's an order rejecting a compliance filing. It is, and requiring it to be refiled. But it was in the context of an ongoing proceeding where the commission had already determined that payments were going to be made for 2005. This is just the how. And they were only going to be made by Energy Arkansas. That's what the math for 2005 was. And the rejection was just the numbers that were used. That's exactly right. Because nobody doubts that Energy Arkansas could have sought judicial review of that order. Right. Energy itself sought re-hearing of the interest. They couldn't have sought re-hearing of an order rejecting it. Energy did. Energy did. Yeah, and there's a re-hearing order on that, which is in the supplemental appendix that the interveners submitted. That is at IA 176. That is the order denying re-hearing. That was on the interest issue. Now, Entergy raised the interest issue both in the remand orders and the compliance orders. They filed, I think, one request for re-hearing in both dockets. The commission answered it in both sets of orders. I think they didn't appeal that. The remand orders did come to this court, but that was on an objection by Louisiana. I think Entergy also objected to it in the first bandwidth proceeding, which this court upheld the requirement of interest in that 2015 decision that's in the federal appendix rather than the federal reporter. I know it's in our brief. I can get that cited for you if you'd like. It was a memorandum of opinion. That's actually where this court upheld Entergy having to pay interest. If one were to think that there is a jurisdictional problem, let's just pretend that you did make the argument. Then you would have made the argument, and you would have said that what should have happened is that the withdrawal issue should have been raised when? On re-hearing of the order rejecting compliance filing at JA-607. As the interveners argued, again. Well, could they have raised it if they hadn't? This is on re-hearing. Wouldn't they have to have raised it even before that then? Their argument is, for the time in which we're out, you can't make us pay. If that's a new argument, they couldn't have made it on re-hearing. Well, the commission entertained the interest argument on re-hearing, so they didn't even try it. But, again, these are some of the calculations. I thought you could raise arguments on re-hearing if they only come about as a result of the order. Even if you haven't raised the argument before, you can raise it on re-hearing if the argument they're raising is caused by the order that you're seeking re-hearing of. And here, I guess the question would be, as I understand the timing, the withdrawal didn't happen until December 2013. Right. So the first time post-withdrawal that an argument could have been made about withdrawal would have been on re-hearing of the compliance order. Yes. Now, I guess everybody knew that withdrawal was going to happen. Right. So even pre-withdrawal, an argument could have been made about the consequence of the withdrawal that we knew was coming. Right. And I would point out, as we did in our brief, every single bandwidth filing continued in litigation after withdrawal. So there are a lot of orders going on in a lot of different proceedings. Like I said, Entergy raised the interest argument in at least three different places. And what your brief says is, nevertheless, on 20, the 2014 compliance order did not explicitly address the issue presented on review, Entergy's pre-withdrawal liability at that time. So I take it that if the reason you didn't press the jurisdictional argument in your brief is because you would have thought that that was enough, that because the withdrawal liability issue wasn't specifically addressed, that didn't need to be raised in seeking re-hearing of the compliance order. I think that's right. Did I not say it right? I think I lost track. Let me put it this way. We're very pleased to hear that even FERC counsel can't completely keep FERC in their mind. It makes us feel way better. Although I enjoy these a little more than you do. Don't we? It's informative. I guess the question, a broader way to ask the question is, if you were going to reach the conclusion that there is no jurisdictional problem and that this can be raised now and didn't have to be sought as part of the re-hearing order, as part of seeking re-hearing of the compliance order, the argument would be that the compliance order didn't specifically address the withdrawal question. That is really the only reason against the right, because certainly the Commission said they could have sought re-hearing, they should have known as a sophisticated entity and experienced participant in these proceedings, and looking at the math for 2005. But yes, the order, that's exactly why I thought the argument was. That's why I'm confused, because your brief said it wasn't explicit. But that's never been the test. The test is not whether it's explicit, it's whether they had sufficient notice. And so what is your position? I get your position on explicitness. What is your position on sufficient notice? I would say there was sufficient notice. The Commission thought there was. And like I said, although we didn't raise the argument, we also can't waive it because it is statutory and jurisdictional. So if the court finds it persuasive, I'm not here to talk you out of that. Can we talk about it? But I could use more help on FERC. I have actually written, I think, three of these cases with respect to collateral problems. Plus a few you've forgotten, I think. Plus a few I've forgotten. And none of them are in this context. That is, it seems like the closest is Southern companies. And in that case, the question is whether they were on sufficient notice that the rule that they are challenging had been decided. And sufficient notice of the rule to which Southern now objects. Now, the rule to which they're objecting here is that they're liable after withdrawal. And there's no opinion of FERC as ruled on that question specifically. And perhaps it's the fault of the other side that they didn't put that question to FERC. That is, no one made the argument, we're not liable because we withdrew. And FERC said, yes, you are. That's what happened in the case before us now. That is not what happened in any of the other cases. Right. So is there any case where we have held, or any other court, that it is a collateral attack where they only should have raised the argument before? Not that they did raise the argument before. I don't know the answer to that. And to be candid, since we didn't raise the collateral attack argument, I did not come prepared to fully argue the case law. I think we're beating you off too much already. It's very unfair. We appreciate it. Go ahead. Go on with the rest of your argument. I'll make one quick note on the rightness argument that we did raise. We did that just to put before the court, for all the bandwidth cases there have been, it's really for the court to decide how piecemeal we want to do this. The court has already considered the remand that says there will be liability for 2005. There's this case on whether Arkansas has to pay. There's the case that we cited that's pending as to the methodology. There's actually another one. Can I ask the same question about this? Do you think this is jurisdictional or prudential? It is prudential. It is just the court. Putting the court on notice that there are, I said two pieces, confessing another mistake. There's actually another ALJ proceeding on the same. But on this one, the commission says it's final, right? Yes. There aren't going to be more facts or anything relevant to this case. It's only a question of law. That's right. Is there a background rule or isn't there a background rule, really, in the end? That's right. With the passage of time, with interest out there, I'm just not sure if there's still principle on which more interest. Would what they owe increase over time? If we could just resolve anything right now, it would be one number. If we have to wait five years, it will be a higher number? I think so. I mean, a lot of what's going on before the commission is disputes over the exact methodology and the dollar figures. I'm not aware that there are one way. But still, as a principle, not just interest, right? Right. That's right. And I believe that with each compliance filing, Entergy makes the payments among the companies. So I think any number you've already seen has already been paid, but I would think that interest would continue to increase. And by Entergy, do you mean the big Entergy or by Entergy Arkansas? Oh, well, the big Entergy flows the payments among the affiliates. So it would be paid by Entergy Arkansas. In all the filings, you see where Entergy Arkansas is paying someone. Those payments have been made. But the litigation over what the dollar amount should have been goes on. And I think it can go up or down. Yeah, Entergy Arkansas is in here. This is all about them not having to pay money. I'm kind of shocked that they seem not to care at all about paying these millions and millions and millions of dollars. Well, and I can't speak for Entergy. My understanding of the Entergy system, at least when we're talking about the Entergy bandwidth agreement world, they're all in the mid-continent ISO now, so I don't know if it's the same. Because they're operating affiliates owned by a holding company, I think in most instances, except they did appeal the interest issue. As far as Entergy is concerned, it's somewhat a zero-sum game. It's one affiliate paying another affiliate. And throughout the history, not just of the bandwidth, but the Entergy system agreement litigation, it has quite often been the various state commissions. Because the Entergy companies operate in, I believe, five different retail regulators' jurisdictions. So Entergy might not care whether Entergy Arkansas is paying Entergy Louisiana, but the Arkansas Commission and the Louisiana Commission care a lot. And the other entities are the Mississippi Commission, the Texas Commission, and the Council of New Orleans. Because home rule, they have retail jurisdiction. So the real interest in these cases is often the Arkansas Commission representing its rate payers versus the Louisiana Commission representing its rate payers and so on. Can I just ask an informational question, which is, before the argument was made in seeking re-hearing of the April compliance order, the April compliance filing, was there any reason to anticipate that there was going to be an argument, that an argument was in the offing to the effect that withdrawal means no responsibility to make payment? I'm not aware of anything, no. There's no other proceeding in which that issue was in the offing? It was a surprise. It was a surprise to the Commission that that argument was being made in April. I believe so. Yes. I was involved in the litigation of the termination in the New Orleans case, where there was talk about continuing obligation for bandwidth payments. And from what Louisiana and New Orleans sought there and what the Commission was discussing and what we were contemplating when we were litigating it, the understanding was always that Louisiana and New Orleans wanted Arkansas to have to continue paying in 2014, 2015, 2016. And that was what the Commission understood it was cutting off. So even having worked on that termination case, I don't know that anyone knew this was coming. I just want to add a couple points on the merits. The Commission did not talk about equitable considerations. It never used the word equitable. We never used that word in our brief. It talks about contract performance. Totally. Equity is not of interest to FERC, is that what you're saying? Oh, no, it is. No, just kidding. Just kidding. Of course it is. That was a joke. Yes. In this case, we actually had contract principles and didn't have to rely on something. Got it. Got it. The basic contract principles. A quick word on the RTO cases, the Regional Transmission Operation cases. I think we've pointed this out in our brief. Every single one of those, the MISO case, First Energy, Duquesne, Louisville, it's always about going forward. It's like cost-shared transmission project allocations, and then you want to leave the RTO. One of the cases involved forward capacity commitments that had been made. It's always about what are you going to pay in the year, either as a lump sum to exit, or in the year after you left, and the year after that, for capital expenditures and things like that that were allocated to you on a going-forward basis. None of those cases talk about something like Judge Garland's example of paying your law clerks. Let's not broadcast that, please. I had a similar analogy involving a lease, but it's much more relatable to everyone in the courtroom, I think, to talk about clerks. Unless the court has any further questions. Is it clear that FERC would have entertained this argument about withdrawal liability in those earlier cases? In which earlier? In the ones that you now say might be a collateral attack. Well, on the compliance order, as I said, Entergy, even though the Commissioner rejected the compliance filing, Entergy raised its argument against interest, against having to pay interest on rehearing. And the Commission did answer that in a rehearing order. So I think there is, from what we know here, there is reason to believe that the Commission would have answered that in a rehearing order. If it didn't, then there certainly would be no basis to argue a collateral attack if the Commission rejected it as an improper. And when they said there was going to be interest for 2005 and for other years as well, for this 2005 period there was going to be interest, is there any entity in the world that was going to have to pay that interest other than Entergy Arkansas? No. What I'm asking is, isn't a compliance filing attack on one limited to challenging the issues that are in that? So there it was about calculation of interest and whether interest was owed. Would they have been able to challenge on the ground, hey, we withdrew, we're not liable at all anyway? Well, since they didn't try, I can't answer that. I do know that in this case FERC did maybe go out of its way to answer the interest issue in two different proceedings when that was raised. So the Commission certainly thought that it was something that should have been raised and that it would have answered. Why would they send it back for a new compliance filing if there was going to be nothing to comply with after December 2013? Well, exactly. When I refer to the math from 2005, for 2005 Entergy Arkansas is the only entity paying money to anyone. So why make another compliance filing if it doesn't include Entergy Arkansas? I don't know. Thank you. I think he's out of time, but we'll give him another two minutes. I just want to go to a couple of points that you raised. Even though we didn't address it in our reply brief, we thought that since the Commission hadn't brought up the argument, in our initial brief, we did raise the question of what you could see in the hearing and to answer Chief Judge Garland's question. In a compliance filing, you can only address. The Commission was very clear. We had raised in the compliance filing some issues. And the Commission said, no, no, you can't raise those issues. You actually did raise them in another re-hearing of a different substantive order. But you can't raise them here. You can only talk about what's in the compliance filing itself. You just said that you had raised your liability post-withdrawal. No, we didn't raise that. It was a totally different issue. I didn't mean to suggest that. I'm just saying that if you read the order, it's in our initial brief. I think we argued this at 25 to 28. You'll see there's a quote from the Commission. In a challenging compliance order, you can only challenge the compliance order. You can't raise these other questions. And so we're pushing that off Arkansas Commission. It was a totally different issue, not this issue. But we're pushing that off. And you raised them in a re-hearing of this other order. And we're going to hold a hearing on that. It isn't a free fall in a compliance hearing. Is there a regulation that governs what can be raised in a compliance hearing, as far as you know? I don't recall offhand. I remember the Commission's sentence. It's pretty clear. Well, that one sounded like you were already addressing that somewhere else. So we don't need to address it here, too, which is a different answer than you forbid to address it here. They sort of put that as a secondary. They first said you can't raise it here. But by the way, you've raised it somewhere else. And we're going to address it there. So I don't want you to think that it was the reverse order. I think the sentence is pretty clear about, and it's quoted in our briefing, and I don't remember it exactly. But you can only raise issues about the compliance filing when you challenge it. I just want to make one other point on the RTO. We've quoted the language. You can read what the language says. It says accrued obligations. It doesn't say future obligations. It says accrued obligations. When you withdraw, you'll be liable for accrued obligations. That is what we have here. Okay. Thank you very much. We'll take the matter under submission. We'll take a brief break while the next group of lawyers moves up.
judges: Garland, Srinivasan, Millett